RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0147p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

ETHEL HARMON,

                    *Petitioner,*

     v.

ERIC H. HOLDER, JR., Attorney General,

                    *Respondent.*

Nos. 12-3268/4173

On Petition for Review of a Decision of
the Board of Immigration Appeals.
No. A079 691 042.

Argued:  December 4, 2013

Decided and Filed:  July 10, 2014

Before:  COOK and STRANCH, Circuit Judges; CARR, District Judge.[*]

_____

## COUNSEL

**ARGUED:**  Maris J. Liss, GEORGE P. MANN & ASSOCIATES, Farmington Hills, Michigan, for Petitioner.  Kelly J. Walls, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Maris J. Liss, George P. Mann, GEORGE P. MANN & ASSOCIATES, Farmington Hills, Michigan, for Petitioner.  Kelly J. Walls, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  Stephen W. Manning, IMMIGRANT LAW GROUP PC, Portland, Oregon, Russell Abrutyn, MARSHAL E. HYMAN & ASSOCIATES, PC, Troy, Michigan, for Amicus Curiae.

---

[*]The Honorable James G. Carr, Senior United States District Judge for the Northern District of Ohio, sitting by designation.

---

**OPINION**

---

STRANCH, Circuit Judge.  Ethel Harmon, an adult who entered the United States as an unaccompanied alien child in 1994, was denied asylum, withholding of removal, and protection under the Convention Against Torture.  Harmon argues that the Immigration Judge did not have jurisdiction over her asylum claim, that the William Wilberforce Trafficking Victims Protection Reauthorization Act (TVPRA) permanently exempts former unaccompanied alien children from the one-year filing deadline for asylum applications, and that the BIA erred by denying her claims on the merits.  For the reasons that follow, we **DENY** Harmon's motion to remand on jurisdictional grounds, and we **DENY** Harmon's petition for review.

## I.      Background

Ethel Harmon was born in Liberia in 1984, a few years before the start of the Liberian Civil War.  Harmon was separated from her parents when she was roughly four-years-old, and afterward lived with several different family members and others.  She testified that she recently got in touch with her brother Clarence who told her that around 1989 Clarence and their mother were captured by a rebel group and Clarence witnessed her rape and the assault that resulted in her death.  Clarence also told Harmon that their father had been killed by a rebel group because they suspected him of being involved with the Liberian government.

Harmon recalls running from one village to another and being caught by a rebel group who separated her from her caretakers and threatened to kill her if she did not remain still.  She saw another girl shot while attempting to flee.  Harmon reports that during this transient period, she was repeatedly sexually molested and raped by her caretakers, by male visitors, and once by a stranger who entered her home while she and a relative fled the war.  Harmon did not disclose the sexual assaults to anyone until she was older, and she has been unable to get her family members to discuss past trauma.

In 1992, Harmon's aunt, Meg Barroar, came to Liberia and took Harmon with her to the Liberian embassy in Gambia, where Barroar worked.  Harmon lived with her aunt for two years

until, when she was ten-years-old, her aunt brought her to the United States on a visitor's visa that would expire in 1995. Barroar took Harmon to live with Harmon's brother Herbert in Maryland. There Harmon remained for some time. She now has no family or connections in Liberia.

Harmon turned eighteen on May 15, 2002. In early 2003, Herbert assisted her in applying for Temporary Protected Status (TPS) from the United States Citizenship and Immigration Service (USCIS), which was approved. Herbert filed a second application on Harmon's behalf in 2004, and this, too, was approved. When Harmon turned 19, she left Herbert's home, and was less successful without his assistance. She missed the TPS deadline while trying to collect money for the application fee, had her next application denied, and mistakenly sent her appeal to the wrong address.

In 2007, when she was twenty-three-years-old, Harmon tried to enter Canada because she had heard that she could get refugee protection, but she was waylaid on the border by Immigration and Customs Enforcement (ICE). Soon afterward, she received notice that she was removable under the Immigration and Nationality Act (INA) § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B) (2012), for remaining in the United States longer than permitted. She appeared before the immigration court for removal proceedings and filed defensive applications for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). The Immigration Judge (IJ) denied these on the merits, approved the previous denial of TPS, and ordered Harmon to be removed to Liberia.

In 2012, the Board of Immigration Appeals (BIA) dismissed Harmon's appeal and denied her motion to terminate proceedings and remand to the USCIS for initial review of her asylum application. Harmon moved to reopen her case, again seeking to terminate proceedings and remand to the USCIS, this time citing a recent Sixth Circuit order sending an asylum application for a forty-year-old former unaccompanied minor to the USCIS for initial review. The BIA construed the motion as a motion to reconsider and denied it as untimely and for failing to establish a legal or factual error in the original decision.

Harmon now appeals the BIA's denial of her motion to reopen and terminate proceedings and moves for a remand to the USCIS on jurisdictional grounds. She also appeals the BIA's

conclusion that she is bound by the one-year filing deadline for asylum applications as well as its denial of her underlying asylum, withholding of removal, and CAT claims on the merits. We consolidate review of a motion to reopen or reconsider with review of a removal order. 8 U.S.C. § 1252(b)(6).

The Government informs the court that while this appeal was pending, Harmon successfully entered Canada and applied for the Canadian equivalent of lawful permanent resident status. While this information is not found in the administrative record, Harmon does not dispute it.

## II.        Our Jurisdiction and the Standard of Review

This court has jurisdiction, under 8 U.S.C. § 1252, to review the BIA's final determination regarding an order of removal. *Umana-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013). Where, as here, the BIA issues its own decision rather than summarily affirming the IJ, the BIA decision is reviewed as the final agency decision, but the IJ's decision is also reviewed to the extent that the BIA adopted it. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). The factual findings of the BIA are reviewed under the highly deferential substantial-evidence standard. *Id*. "Under this standard, we will not reverse a factual determination . . . unless we find that the evidence not only supports a contrary conclusion, but *compels* it." *Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir.2007) (internal quotation marks omitted); *see also* 8 U.S.C. § 1252(b)(4)(B). We review the legal conclusions of the BIA de novo, first asking whether the immigration statute is clear; if it is silent or ambiguous, we give deference to the agency's reasonable interpretation.[1] *Flores v. U.S. Citizenship & Immigration Servs.*, 718 F.3d 548, 551 (6th Cir. 2013); *see also Umana-Ramos*, 724 F.3d at 670; 8 U.S.C. § 1252(b)(4)(D) (granting authority to reverse a removal order where the decision is manifestly contrary to law or an abuse of discretion). Harmon's appeal of the BIA's denial of her motion to reopen

---

[1]Because the relevant portions of the INA are unambiguous, as discussed below, we have no occasion to address the parties' arguments about whether the unpublished BIA opinion here should receive "*Chevron* deference" or "*Skidmore* deference." *Compare I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (holding that the BIA should be accorded *Chevron* deference), *and Umana-Ramos*, 724 F.3d at 670 (noting that this court uses arbitrary and capricious review for BIA interpretations), *with Flores*, 718 F.3d at 551 (applying *Skidmore* deference to BIA's interpretation of a non-immigration statute), *and Japarkulova v. Holder*, 615 F.3d 696, 700-01 (6th Cir. 2010) (suggesting that non-precedential, single-member BIA decisions are not entitled to *Chevron* deference).

proceedings is reviewed for abuse of discretion, *Liu v. Holder*, 560 F.3d 485, 489 (6th Cir. 2009), but an error of law is always abuse of discretion. *See*, *e.g.*, *Serrano v. Cintas Corp.*, 699 F.3d 884, 902 (6th Cir. 2012).

### III.    Mootness

We first briefly address the Government's contention that Harmon's appeal has become moot because she went to Canada and applied for permanent Canadian status while this appeal was pending. Appeals from removal orders are reviewed based only on the facts found in the administrative record, 8 U.S.C. § 1252(b)(4)(A), which contains nothing about Harmon's status in Canada other than the Government's statement. Nevertheless, Harmon admits that she went to Canada "in compliance with an order of removal."

Mootness doctrine arises from the Article III requirement that courts may only consider a live controversy. The Government, as the party seeking mootness, bears a heavy burden to demonstrate that it applies here. *L.A. Cnty. v. Davis*, 440 U.S. 625, 631 (1979). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* (internal quotation marks omitted). Harmon has a cognizable interest that defeats mootness, if she "suffered, or [is] threatened with, an actual injury traceable to" the Government and if the injury "is likely to be redressed by a favorable judicial decision." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990).

Harmon's appeal is not moot. She has suffered an injury—the removal order—that could be redressed by an outcome vacating the removal order or giving her protected status with entry privileges. To the extent that Harmon removed herself pursuant to the removal order, the "removal of an alien does not moot a pending appeal" because the alien continues to suffer an ongoing injury in the form of the five-year restriction on re-entry. *Garcia-Flores v. Gonzales*, 477 F.3d 439, 441 n.1 (6th Cir. 2007); *see also* 8 U.S.C. § 1182(a)(9)(A)(i). The Government cites cases dealing with aliens who failed to appear at removal proceedings, suggesting that Harmon, like those petitioners, has mooted her claim by ensuring that an adverse judgment cannot be enforced against her. *Gonzales-Flores*, 477 F.3d at 440-42. This suggestion is misplaced. Harmon is not a "fugitive" like the alien in *Garcia-Flores* who chose to stay in the United States while avoiding authorities; she left the country, as ordered, but continues to pursue

her rights *through* the authorities.  The Government has cited no case suggesting that removal may only occur on the Government's dime.

The Government's suggestion that remand would be futile does not present a mootness issue.  The Government's arguments related to the futility claim, moreover, are not based in law. Harmon has not received an offer of permanent status subjecting her to the firm resettlement bar. *See* 8 U.S.C. § 1158(b)(2)(A)(vi); 8 C.F.R. § 208.15; *see also Hanna v. Holder*, 740 F.3d 379, 393-94 (6th Cir. 2014).  The rule of abandonment has not been extended to removal pursuant to a removal order.  *See* 8 C.F.R. § 1208.8(a); *Garcia-Flores*, 477 F.3d at 441 n.1.  And the cases from other circuits discouraging "country-shopping" have not been applied to an immigrant who seeks an alternative place of refuge *after* a removal order.  *See Sall v. Gonzales*, 437 F.3d 229, 231, 233 (2d Cir. 2006) (noting, in the context of an asylum claim by a person firmly resettled in a third country *prior to* entering the United States, that asylum is for those with nowhere else to turn); *Maharaj v. Gonzales*, 450 F.3d 961, 989 (9th Cir. 2006) (O'Scannlain, J., concurring in part and dissenting in part) (condemning "country-shopping" by a petitioner who had a pending asylum appeal in a third country *before* entering the United States).

We therefore review Harmon's appeal on the merits.

### IV.     Initial Jurisdiction Under the TVPRA

Harmon argues as she did before the BIA that the TVPRA vests original jurisdiction in the USCIS for asylum claims brought by all current and *former* unaccompanied minors and that, therefore, the IJ did not have authority to deny her asylum claim.

The TVPRA was enacted in 2008 "to enhance measures to combat trafficking in persons."  TVPRA, Pub. L. 110-457, 122 Stat. 5044 (2008).  The portion of the legislation at issue here—"an important step to protecting unaccompanied alien children" who had "been forced to struggle through an immigration system designed for adults"—creates new procedures for unaccompanied alien children.  TVPRA § 235(d); Cong. Rec. S10886-01 (daily ed. Dec. 10, 2008) (statement of Sen. Feinstein, cosponsor of original Senate version).  One of these protections gives unaccompanied alien children the right to have their asylum applications reviewed in the first instance by an asylum officer with the USCIS.  TVPRA § 235(d)(7)(B)

(codified at 8 U.S.C. § 1158(b)(3)(C)).  This is a deviation from the procedure for adults, in which the right to seek asylum from the USCIS is lost once a Notice to Appear in immigration court is issued.  *See* USCIS, Memorandum 2 (Mar. 25, 2009).**2**

Section 1158(b)(3) of Title 8 now provides that "[a]n asylum officer . . . shall have initial jurisdiction over any asylum application *filed by* an unaccompanied alien child."  8 U.S.C. § 1158(b)(3)(C) (emphasis added).  An "unaccompanied alien child" is defined as one who 1) "has no lawful immigration status in the United States," 2) "has not attained 18 years of age," and 3) either has no lawful parent or guardian in the United States or has none available to provide care or custody.  6 U.S.C. § 279(g).  Harmon argues that the new jurisdictional provision applies to her application for asylum as an adult because the new TVPRA protections—which appear in a section of the TVPRA entitled "Permanent Protections for Certain At-Risk Children"—were intended to "permanently" protect those who were vulnerable, unaccompanied minors *at the time they entered the United States*.  *See* TVPRA § 235(d).

Harmon is incorrect.  The language "filed by an unaccompanied alien child" creates simultaneous statutory requirements—filing the asylum application while an unaccompanied alien child.  Harmon was not a child when she filed her asylum application at the age of twenty-three.  The provision simply does not apply to her.

Harmon's argument that the TVPRA section heading "Permanent Protections" broadens the meaning of the jurisdictional provision to cover former unaccompanied alien children is not persuasive.  The section heading indicates that once an unaccompanied alien child files an asylum application, the USCIS maintains jurisdiction even if that person turns eighteen while the application is pending.  *See* USCIS, Memorandum 3, 4 (Mar. 25, 2009) (interpreting its own jurisdiction).**3**  Viewing the statute as a whole, nothing in the TVPRA or the statute it revised

---

**2***available at*
http://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Refugees%20%26%20Asylum/Asylum/Minor%20Chi
ldren%20Applying%20for%20Asylum%20By%20Themselves/jurisdiction-provision-tvpra-alien-children2.pdf.

**3***See also* USCIS, Questions and Answers: Updated Procedures for Determination of Initial Jurisdiction over Asylum Applications Filed by Unaccompanied Alien Children 2 (June 10, 2013), *available at* http://www.uscis.gov/sites/default/files/USCIS/Refugee%2C%20Asylum%2C%20and%20Int%27l%20Ops/Asylum /ra-qanda-determine-jurisdiction-uac.pdf ("USCIS will accept a prior UAC status determination" that was in place when the immigrant filed an asylum application even if the immigrant turns eighteen during the process.).  Harmon has not alleged that she ever received a favorable status determination.

suggests that the jurisdictional provision applies to *formerly* unaccompanied alien children.  *See Flores*, 718 F.3d at 551 (noting that this court interprets a statute by considering "the language of the statute itself, the specific context in which that language is used, and the broader context of the statute as a whole" (internal quotation marks and brackets omitted)).

Harmon also points to an order filed by a non-oral argument panel of this court in *Alnaham v. Holder*, No. 10-3488 (6th Cir. Mar. 26, 2012).  There, this court terminated removal proceedings against a 40-year-old man who had entered the United States as a minor so that his asylum application could be reviewed in the first instance by the USCIS, supposedly pursuant to the TVPRA.  *Id.*  The Government's attempt to distinguish *Alnaham* is unavailing.  *Alnaham* appears factually similar to the present case for all relevant purposes.  Nevertheless, this per curiam order has no controlling weight, and the plain meaning of the statute contradicts it.

We hold that the TVPRA does not transfer initial jurisdiction over asylum applications filed by former unaccompanied alien children to the USCIS.  The IJ, therefore, had the authority to review Harmon's asylum claim.

## V.    Asylum

Harmon claims that the BIA erred both by denying her asylum claim as untimely and by denying it on the merits.

We have jurisdiction to consider timeliness questions, like the one here, that involve the construction of a statute.  *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006).  Under 8 U.S.C. § 1158(a)(1), any alien who is physically present in the United States may file for asylum.  Subparagraph (B), however, specifies that the right to asylum "shall not apply to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States."  8 U.S.C. § 1158(a)(2)(B).  The TVPRA modified this exception, adding that subparagraph "(B) shall not apply to an unaccompanied alien child."  TVPRA § 235(d)(7)(A) (codified at 8 U.S.C. § 1158(a)(2)(E)).  Harmon argues, supported by amicus, that the new TVPRA provision means that once a person is an unaccompanied alien child in the United States, the time limitation imposed in subparagraph (B) shall *never* apply to that person, even when she is no longer an

unaccompanied alien child.  Harmon argues that this interpretation makes sense in light of the goals of the TVPRA as well as the pre-existing protections that the TVPRA was intended to supplement.  The government responds that the new TVPRA provision only relieves an unaccompanied alien child of the *burden to prove* compliance with the one-year time limit while she remains a child, but never relieves her of the time limit itself.  This is an open question in the Sixth Circuit, but we do not resolve it because Harmon's asylum claim fails.

An alien is eligible for asylum if she demonstrates that she is a refugee, meaning that she "has suffered past persecution on the basis of race, religion, nationality, social group, or political opinion; or ... show[s] that . . . [s]he has a well-founded fear of persecution on one of those same bases."  *Cruz-Samoyoa v. Holder*, 607 F.3d 1145, 1150 (6th Cir. 2010) (internal quotation marks omitted); *see also* 8 C.F.R. § 1208.13(b).  General conditions of rampant violence alone are insufficient to establish eligibility.  *Umana-Ramos*, 724 F.3d at 670.  Rather, the context must indicate that the applicant was targeted "based on h[er] membership in a protected category."  *Id*. at 671 (internal quotation marks omitted).  Because Harmon filed for asylum after May 2005, she is subject to the Real ID Act, which requires her to show that her membership in a particular group was or will be at least one central reason for the persecution.  *Id*.; *see also* 8 U.S.C. § 1158(b)(1)(B)(i).

Harmon based her claim of past persecution on her family's political opinions.  According to her, her mother and father were killed because of their political support of the government, and the horrific violence and sexual assaults she experienced were tied to her parents' political opinions.  *See Thap v. Mukasey*, 544 F.3d 674, 681-82 (6th Cir. 2008) (suggesting that persecution on account of the political opinions of one's family can form the basis of an asylum claim); *Akhtar v. Gonzales*, 406 F.3d 399, 406 (6th Cir. 2005) (suggesting that the political opinions of one's family can be imputed to the applicant if the applicant suffered as a result of it).  The BIA concluded that Harmon proved only that she was a "general victim[] of widespread violence" during the Liberian Civil War.  In other words, Harmon did not establish any nexus between the attacks and her membership in any protected group.  *See, e.g.*, *Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004) (requiring that the harm be motivated by membership in a protected group rather than civil unrest).

The BIA was not "compelled" to conclude to the contrary. Harmon's testimony about the political basis for her parents' death was not strong. She said that her brother Clarence told her that "my father was carried away (indiscernible) of him being involved in, I don't know, government or something. They assume he was involved in something, and I don't really know the entire story, but that he was killed by rebels." When asked whether her father was actually involved with the Liberian government Harmon responded "[n]ot that I know of." One cannot expect an applicant to have a perfect memory of events that occurred when she was four-years-old. *See Yu Yun Zhang v. Holder*, 702 F.3d 878, 881-82 (6th Cir. 2012) (overturning BIA decision where it rejected evidence for being unsworn, an unreasonable requirement under the circumstances). This evidence, however, does not unquestionably show that the deaths of Harmon's parents were tied to their political opinions, much less that her own persecution was tied to it. The harm Harmon suffered was reprehensible, but she simply has not met her burden under the statute to show that it was connected to a protected ground.

Harmon bases her claim of "well-founded fear" of future persecution on her membership in another social group—foreign women. Pointing to two studies indicating that rape and female genital mutilation often go unprosecuted in Liberia, Harmon argues that as a foreigner, she would not know how to avoid victimization. The BIA assumed that "foreign women" comprise a protected social group. Assuming that it does, the BIA was not compelled to conclude that Harmon has a genuine and objectively reasonable fear tied to her membership in this group. *See Rreshpja v. Gonzales*, 420 F.3d 551, 555 (6th Cir. 2005). The Liberian country reports show problems with the prosecution of rape but also efforts to curb the problem. Moreover, the reports do not show that adult women are targeted for female genital mutilation or that foreign women are targeted for rape.[4]

## VI.    Withholding of Removal and the Convention Against Torture

Harmon's claim for withholding of removal similarly fails. To qualify for withholding of removal, an applicant must show that "there is a clear probability that [s]he will be subject to persecution if forced to return to the country of removal" on account of race, religion,

---

[4]In fact, one report shows that a special court for rape and sexual violence has been opened in Monrovia.

nationality, membership in a social group, or political opinion.  *Umana-Ramos*, 724 F.3d at 674 (internal quotation marks omitted).  While withholding of removal is mandatory rather than discretionary as is asylum, the burden for withholding of removal is the more stringent of the two.  *Khalili*, 557 F.3d at 435-36.  Harmon argues only that there is a clear probability that if she is removed to Liberia she will be targeted for rape and female genital mutilation on account of her status as a foreign woman.  This argument failed under the asylum claim, and it must similarly fail here.

Harmon's claim for protection under the Convention Against Torture (CAT) fails for a different reason: she did not exhaust her administrative remedies.  *See Lin v. Holder*, 565 F.3d 971, 979 (6th Cir. 2009) (denying a CAT claim because this court has no jurisdiction where the petitioner did not exhaust a claim before the BIA).  The only mention of the CAT claim in Harmon's BIA appeal was a generic request on the final page that the BIA "grant CAT relief," and the BIA did not consider this claim.  *See Ramani v. Ashcroft*, 378 F.3d 554, 559-60 (6th Cir. 2004) (rejecting claim as unexhausted where petitioner did not advance the substance of her argument before the BIA and where the BIA did not consider the claim on the merits).  This claim, therefore, is not subject to review by this court.

## VII.    Conclusion

For the reasons explained above, Harmon's motion to remand to the BIA for termination and referral to the USCIS and her petition for review are both **DENIED**.